MARTIN WHITE, Appellant, v. N. P. SHELDON, Re-
spondent.

Professional Services as a Consideration. The rendition of professional
services is as sufficient a consideration to create a trust in favor of the person
rendering them as the payment of money would be.

Statute of Limitations as to Trust. The statute of limitations does not
apply to those cases of express and direct trusts in which the *cestui que trust*
has not a full and adequate legal remedy; but where he has such remedy the
statute will toll the equitable remedy precisely as it would the legal.

Limitations of Equitable Actions. The statute of limitations embraces all
characters of actions, legal and equitable, and is as obligatory upon the courts
in a suit in equity as in actions at law.

When Cause of Action Accrues against Trustee of Express Trust. A
*cestui que trust* of an express trust has no right of action until the trust is de
nied or some act is done by the trustee inconsistent with the trust; and until
then the statute of limitations does not begin to run.

Demand upon Trustee, when Necessary. When a person takes a title in his
own name at the request of another, who furnishes the consideration, the
former has the right to presume that he is to hold it until a demand is made
upon him for it.

Evidence—Parol Proof as to Trusts. An express trust cannot be created
by parol; but all the facts and circumstances out of which an implied trust is
raised may be proved by parol, such as the fact that the alleged *cestui que trust*
furnished the money with which the alleged trust property was purchased, and
that such money was not merely loaned.

Presumptions from Advance of Money. The mere circumstance of money
being advanced by one person to another would give rise to a presumption of a
loan or payment of a debt, and not to the presumption that it was furnished
for the purchase of property in trust.

Actions against Trustees—Nature and Limitations of. In a case of the
purchase of property alleged to be in trust, where it became necessary for the
plaintiff to establish facts out of which the trust arose, and then to show that
the trust property had been converted into money: *Held*, that under the cir-
cumstances the ordinary action for money had and received to plaintiff's use
would not lie against the trustee, and that the section of the statute of limita-
tions applicable was the four years' limitation and not the two years' one.

Appeal from the District Court of the First Judicial District,
Storey County.

This cause was tried before the Judge of the Third Judicial Dis-
trict, who for the time occupied the bench. The matters of fact
found by him are stated in the opinion. As conclusions of law he
found that no trust existed at any time in Johnson in favor of

White v. Sheldon.

White as to any of the mining ground purchased by Johnson, nor any trust at any time in Sheldon after the property passed into him.   The judgment was for the dismissal of the plaintiff's bill with costs.

*D. Corson* and *R. H. Taylor*, for Appellant.

### I.

The findings of the Court show that the trust in Johnson was an implied or resulting trust, which is exempted from the operation of the Statute of Frauds, and may be established by parol testimony.

### II.

The Court finds that Sheldon took a conveyance of the trust property from Johnson with full knowledge of the equitable title of plaintiff, and hence a Court of equity will hold Sheldon as trustee to the same extent and with the same liabilities as Johnson, the rights of plaintiff being neither increased nor diminished by reason of the conveyance from Johnson to Sheldon.   (*Millard* v. *Hathaway*, 27 Cal. 139; *Malin* v. *Malin*, 1 Wend. 625.)

### III.

The facts found by the Court show a trust which is a mere creature of a court of law, (as a trust is to be established and an account taken) and as to such trusts the Statute of Limitations does not commence to run until the trustee denies the right of the *cestui que trust*, and holds adversely to him, of which the *cestui que trust* has notice.   (2 Story's Equity, 1520 a; *Kane* v. *Bloodgood*, 7 John. Ch. 123; *Boyd* v. *McLean*, 1 John. Ch. 591; *Ord* v. *De La Guerra*, 18 Cal. 73; *DeCouche* v. *Savillier*, 3 John. Ch. 214; *Coster* v. *Murray*, 5 John. Ch. 592; *Wilson* v. *Watkins*, 3 Peters, 51; *Prevost* v. *Gratz*, 6 Wheaton, 481; 1 Story's Equity, 29, 59, 465; 2 Story's Equity, 960.)

### IV.

Defendant cannot avail himself of the Statute of Frauds, as he has not pleaded the same in his answer.   (*Osborn* v. *Endicott*, 6 Cal. 149.)

19

*E. W. Hillyer*, for Respondent.

I.

All agreements of the parties testified to, tending to establish a direct trust, or to give to an implied trust any different character or effect from that which by operation of law would result from the acts of the parties, are void under the Statute of Frauds. (*Dow* v. *Jewell*, 1 Foster, 488 ; 2 Leading Cases in Equity, 706 ; 2 Story's Eq., Sec. 1201, a ; *Parker's Heirs* v. *Bodley*, 4 Bibb, 102 ; *Bottsford* v. *Burr*, 2 Johns. Ch. 404 ; *Sturtevant* v. *Sturtevant*, 20 N. Y. 39 ; *Steene* v. *Steene*, 5 Johns. Ch. 1.

II.

The trust resulting from the payment of the purchase money must be a pure, unmixed trust of the ownership and title, and not of the proceeds. (*Dow* v. *Jewell*, 1 Foster, 488.)

III.

White having consented to the making of an absolute deed to Sheldon, cannot prove by parol that such deed was in trust. (*Sturtevant* v. *Sturtevant*, 20 N. Y. 39.)

IV.

The trust, if any, imposed on Sheldon was an *implied* one, and was within the Statute of Limitations. (2 Story's Eq., Sec. 980 ; *Sheppards* v. *Turpin*, 3 Graham, Va. 373 ; *Murdock* v. *Hughes*, 7 S. & M. 219 ; *Beckford* v. *Wade*, 17 Vesey, 86 ; 11 B. Monroe, 161 ; Angell on Limitations, 171.)

V.

The statute began to run when Sheldon received the deed from Johnson. (2 Story's Eq., Sec. 1521, a ; Hill on Trustees, 389, Wharton's note ; *Strimpfler* v. *Roberts*, 18 Penn. State, 283.)

VI.

Had this been an express trust, the sale of the ground, in 1863, would have set the statute in motion. (*Kane* v. *Bloodgood*, 7 Johns. Ch. 123 ; Angell on Limitations, 171.) The conversion

of the stock into money perfected the right of action, (*Atwater v. Fowler*, 1 Ed. Ch. 423·; *Murray* v. *Coster*, 20 Johns. 585; *Stafford* v. *Richardson*, 15 Wend. 302) and White, if he had any rights, had his action for money had and received in the fall of 1863. (*Arnes* v. *Ashley*, 4 Pick. 70.)

## VII.

Lapse of time and staleness of a claim is a good defense in equity, even in cases where the Statute of Limitations has no application. (1 Story's Eq., 64 *et seq.*; 2 Story's Eq., 1284, 1520 *et seq.*; *Dow* v. *Jewell*, 1 Foster, 488; *Strimpfler* v. *Roberts*, 18 Penn. State, 283.)

By the Court, LEWIS, J.

The material facts involved in this case are very fully presented in the proceedings of the Judge below, from which the following may be adopted as a statement of the case sufficient for an understanding of the questions presented for determination upon this appeal.

"That N. P. Sheldon, defendant, was in 1861 and theretofore and so continued to be a tenant in common with certain persons composing and known as the Uncle Sam Mining Company, and as such tenant in common held an undivided interest of thirty-five feet, more or less, in said company's mining ground, situated between Virginia City and American Flat, in what is now Lyon County, State of Nevada, then Carson County, Territory of Utah.

" That one H. W. Johnson at that time resided in said locality, and represented the interests of one or more owners in said Uncle Sam Mining Company's mining ground.

" That the amount of ground held by said company at that time was three thousand feet, and consisted of what was known as the Uncle Sam Mine.

" That at said date the said company was embarrassed with debts to the amount of several hundred dollars, owing to the fact that several members of the company neglected to pay their proportion of the assessments that had been from time to time levied upon the members of said company for the prospecting and development of their said mine.

" That early in the year A. D. 1861, several suits were brought before one William Smith, then an acting Justice of the Peace within and for said Carson County, against the members of said Uncle Sam Mining Company, upon the part of some six, seven, or more persons holding the indebtedness against said company, as hereinbefore mentioned, which suits were prosecuted to judgment and executions issued thereon—under and by virtue of which executions the acting Constable of the Silver City precinct (in which said Justice of the Peace resided) levied upon and sold at judicial sale all or very nearly all of said three thousand feet of said mining company's ground to the said H. W. Johnson, and executed to said Johnson conveyances for the mining ground so sold.

" That the plaintiff Martin White, as the attorney-at-law of the parties plaintiff in said suits, commenced, conducted and prosecuted to judgment said suits in person, and generally performed all needful professional services in said suits for said plaintiffs, and entered therein of record the firm name of ' Redman, Clement and White,' as attorneys for said plaintiffs in said suits.

" That at said judicial sales of said mining ground the said H. W. Johnson bid in the property in his own name, and deeds were thereafter given by said Constable in his (Johnson's) own name as grantee for said mining ground.

" That all the consideration which was received by said Constable at said sale was paid by or came from the defendant herein, N. P. Sheldon, and no part of the same was paid by said Johnson.

" That owing to said embarrassments of said Uncle Sam Company it was found impracticable prior to the bringing of said suits to proceed further with the development of said mine, and it was concluded among several of those persons interested that it was necessary to get rid of the non-paying members of the company, and if possible, to establish the affairs of the company upon a better basis, and to this end to employ the services, and procure the counsel of an attorney-at-law.

" That, thereupon, the defendant Sheldon and the said Johnson entered into a parol understanding with the plaintiff, with a view generally to relieving the then condition of the mine, by dispossessing the said non-paying members, securing to the paying members

their several interests in the mining ground and paying off the debts of the company, and with the view more particularly to the benefit of said plaintiff White, defendant Sheldon, and said Johnson, by securing to themselves the interests then held by said non-paying members.    Said parol understandings between said White, Sheldon, and Johnson, was to the effect that said Sheldon was to purchase with his own means, and get into proper shape for suits at law, all the outstanding indebtedness against said company, and to pay all the costs of such suits.    Said plaintiff White was to perform all needful legal services in bringing such suits, conducting to judgment, and giving such counsel from time to time as should be proper and needful in the premises; and to cause the mining grounds of said company to be sold under executions to be issued ·upon such judgments.

" The said Johnson to bid in the said mining ground at such sale in his own name, and to hold that portion of the same not redeemed by the paying members of said company, in equal moieties for himself and in trust for said Sheldon and said White, (one-third to each) or to divide equally among the three persons the proceeds of such residue of mining ground, if sold.

" That immediately thereafter, and in consideration of, and pursuant to said agreement, the said White brought and prosecuted to judgment as aforesaid the said suits, and caused the sale aforesaid to take place, making no specific charge against any person or persons for any fee for legal services so rendered.

" That after said judicial sales of said mining ground to said H. W. Johnson, (which said sales occurred on or about the ———— day of February or March, A.D. 1861) to wit: on the twenty-third day of June, A.D. 1861, the said Johnson made, executed, acknowledged and delivered unto the said N. P. Sheldon a deed (quit-claim in form, with covenant on the part of the grantor, that he ' had full right and power to sell and convey the said premises, and that the said premises are now free and clear from all incum· brances, sales or mortgages, made or suffered by the said party of the first part') of all the right, title, and interest of the said Johnson in and to his entire undivided interest in that certain quartz ledge, formerly known as the Uncle Sam Ledge, and ' now known as the

Atlantic Ledge, and owned by the Baltic Company, situated in Gold Hill Mining District of Carson County,' (Utah Territory) together with all the appurtenances, etc., but that said deed specified no number of feet nor quantity of mining ground in terms.

" That after said Constable's sale, and prior to the said deed from Johnson to Sheldon, the said Johnson had executed deeds of portions of said mining ground to the paying members of the company, amounting in all to nearly or quite two thousand feet, so that at the date of the said deed to Sheldon, said Johnson had, in fact, a claim to the legal title of only one thousand feet, or a little over, of said mining ground, which could be subjected to the contemplated distribution under said parol agreement between said Johnson, Sheldon, and White.

" That the deeds to said Johnson from said Constable were delivered not to Johnson, but to the said Sheldon, after the deed from Johnson to Sheldon, and upon the delivery of said deeds, the said Sheldon paid to the said Constable all arrears of the debts and costs of said suits, amounting to a great portion, if not all of the costs and expenses at any time due by virtue of said suits and sales.

" That at the time of the deed from Johnson to Sheldon, said Sheldon had no notice of the fact that the Constable's deeds had not been delivered to Johnson, but that said Sheldon made the purchase of, and took the conveyance from said Johnson, under the theory and supposition that said Johnson held the Constable's deeds.

" That in 1863 Sheldon sold all that he held remaining of the Uncle Sam ground, to the Uncle Sam and Baltic Companies, in trust for the corporations and stockholders, in the usual manner, upon the incorporating of those companies, receiving in consideration therefor stock in those companies, or interests in stock, and finally, from time to time disposing of the stocks and mining ground at rates now not appearing to this Court.

" That from and after the deed from Johnson to Sheldon the said Sheldon, at no time until the summer of 1866, ever distinctly disputed the alleged trust as to a one-third portion of the ground in favor of the said Martin White, nor yet at any time does it appear

.that Sheldon explicitly admitted or avowed the existence of the said alleged trust; yet from the character of conversations—which are testified to as occurring from time to time between said Sheldon and White until said year 1866, it is found as a fact that Sheldon was at all times fully aware of the fact that White claimed an interest in the Uncle Sam mining ground and stock held by Sheldon, as also in the money realized by him (Sheldon) therefrom, and never denied the rights of White, although frequently in effect asserted by White, and although frequent opportunities were offered for such denial, until said year 1866.

" That since the date of the deed from Johnson to Sheldon the mining ground and stocks have risen to great value in the mining stock market, but that no account thereof has at any time been made by said Sheldon to said White as to any of Sheldon's dealings as to said mining ground or stocks."

The principal facts here stated are alleged in the bill, and the relief sought is shown by the prayer, which is thus framed: " Wherefore, inasmuch as this plaintiff is without remedy at law in the premises, he prays the judgment of this honorable Court, and that said defendant may be decreed to be a trustee of this plaintiff for the said one-third of the one thousand feet of the Uncle Sam Company's mining ground, to wit: 333⅓ feet, and of all moneys or property derived from a sale, or an exchange of the same in any manner whatever, and that said defendant may be decreed to account to this plaintiff for all moneys or property derived in any manner from the sale or exchange of said three hundred and thirty-three and one-third feet of said mining ground and of all stocks now on hand received in exchange for said mining ground or of any part thereof. And that upon the amount due this plaintiff from said defendant being ascertained, that he may be decreed to pay the same to this plaintiff, with legal interest and costs of suit. And this plaintiff prays for such other and further relief as may be just and equitable in the premises."

The defendant, by his answer, denies all the material allegations of the complaint, and also pleads the Statute of Limitations. Upon these facts it is argued that the services performed by White did not raise an implied trust in his favor. Counsel attempt to make

a distinction between the payment of money in cases of this kind and the rendering of services, but we apprehend the distinction is one not recognized in the books nor maintainable on principle. Equity looks to the consideration, and creates a trust in favor of him who furnishes it, regardless of whether such consideration be money or labor, or property given in exchange. Implied trusts are based upon the broad principle that he who furnishes the consideration is entitled to the property, and equity does not permit any unsubstantial distinctions to defeat the operation of its liberal and rational rules. We know of no principle of ethics or equity which would justify the creation of a trust in favor of him who furnishes money wherewith to purchase property, that would not also create it in favor of him who renders services or labor for the same purpose.

The property in question was acquired by the services of the plaintiff and the money of the defendant, and we can see no reason why their rights should not be precisely the same as if both had furnished money. We therefore unhesitatingly conclude that the facts found by the Judge below raised an implied trust in favor of the plaintiff.

The question raised upon the plea of the Statute of Limitations is one not so easily solved or readily disposed of. Whether actions brought to enforce trusts growing out of the relation of trustee and *cestui que trust* come within the Statute of Limitations has been a very perplexing question in the Courts, and one upon which it must be admitted there appears to be much confusion in the books. These propositions seem now, however, to be very well established by the later adjudications : First—That the Statute of Limitations does not apply to those cases of express and direct trusts in which the *cestui que trust* has not a full and adequate legal remedy. Second—In cases of express trusts where the *cestui que trust* had a complete legal remedy, the statute will toll the equitable remedy precisely as it would the legal. Third—That all implied trusts are within the statute.

The question, however, as to whether trusts are within the statute is not left open to discussion in this State, for it is clear that our Statute of Limitations embraces all characters of actions,

legal and equitable, and is as obligatory upon the Courts in a suit in equity as in actions at law. (*Lord* v. *Morris*, 18 Cal. 484.) The English statutes only applied to actions at law; the Courts of equity, however, although not bound by them, generally adopted them as rules of practice.

The only facts, therefore, generally necessary to be ascertained in this State, are : First—The precise time when the statute begins to run in each particular case ; and, Second—Which clause of the statute covers the case ? and these are the only questions now necessary to be determined in this suit. The first section of our Statute of Limitations declares, " That civil actions can only be commenced within the periods prescribed in this act *after the cause of action shall have accrued.*"

In ascertaining, then, whether the statute has run against an action, the time must be computed from the day when *the cause of action accrued.* At what time, then, did the cause of action accrue to the plaintiff in this case ? It is claimed on his behalf that he had no right of action until the trust was denied or some act was done by the trustee inconsistent with the trust, and such is the conclusion at which we have arrived. Johnson became a trustee at the request of the plaintiff. He attended the sales, bid on the property, and took the certificate of sale in his own name, in exact accordance with the agreement entered into between himself, Sheldon, and White. And from the fact that it was their intention to convey a large portion of the ground so purchased to various members of the mining company, it may naturally be inferred that it was also the understanding that Johnson should hold the legal title until all such conveyances were made, as a matter of convenience in making such conveyances. But whether any such understanding existed or not, the legal title having been taken by Johnson at the request of the plaintiff, the presumption is that he continued to hold it at the request of the plaintiff. Such being the case, the plaintiff could have no right of action against Johnson until the trust was repudiated or the trustee did something inconsistent with the plaintiff's rights. White may have had a right to demand a deed from Johnson for his interest in the mine immediately after the sale, but until such demand, and a refusal to

make the conveyance, or until some other act by the trustee in-consistent with the trust, no cause of action could have accrued to White.   Can it be said that a trustee who accepts a trust at the request of the *cestui que trust*, and who does nothing inconsistent with it, may be sued at any time that the *cestui que trust* has a right of action against him, when no breach of duty is shown.   A right of action usually arises only from a violation of contract, a breach of trust, or from injuries to person or property.   But the plaintiff in this case could not have charged Johnson with either the violation of any contract, any breach of trust, or any injury to his property.   It cannot be claimed that a civil action may be maintained against a person for an act done at the request of the person suing, and yet that is all that could be alleged against Johnson, for it is shown that he took the certificates in his own name at the plaintiff's request.

    That fact of itself would not then give White a right of action. Nor would the fact that he continued to hold the legal title be any more effectual, for the presumption was that it was held in accord-ance with the plaintiff's wishes until something was done to over-come such presumption.   When a person takes the title in his own name at the request of another he has the right to presume that he is to hold it until a demand is made upon him for it.   Where per-sonal property is delivered into the possession of a bailee by the owner, and no time is fixed for its return, no right of action accrues to the owner against the bailee until a demand is made for the re-turn of the property, or something is done by the bailee inconsist-ent with the rights of the real owner.   So in a case of this kind it is difficult to understand how a cause of action accrues until the trustee does something repugnant to the trust or the rights of the *cestui que trust*.

    Had Johnson's conveyance to Sheldon, in June, A. D. 1861, been made without the consent of White, a right of action would have accrued to him at that time, for such a conveyance would have been a virtual denial of the trust; but it appears White expressly agreed to the conveyance before it was made.

    In reply to the question propounded by counsel, whether, by con-veying to Sheldon, he violated any agreement or understanding be-

tween himself and the plaintiff, Johnson replied, "No; for I made the conveyance to Sheldon with White's consent, and in trust for White, with the express understanding between Sheldon and myself that he would carry out our agreement made in regard to White's interest." Thus Sheldon after the conveyance occupied precisely the same position which Johnson did before. He took the legal title not in violation of or opposition to any rights of plaintiff, but with his consent. Hence what has been said with respect to a right of action against Johnson will equally apply to the defendant.

Some cases are referred to by counsel for respondent which it is claimed support the proposition that the cause of action accrues in cases of implied trust immediately upon the happening of the facts and circumstances out of which the trust is created. That that would be the time at which in a majority of cases the statute would begin to run, there is no doubt, because trusts of this kind generally originate in some breach of duty or wrong on the part of the trustee, so giving the *cestui que trust* an immediate right of action. As if for example, Johnson, without authority from White or Sheldon, had taken the Constable's conveyance or certificate of sale in his own name, a right of action would immediately have accrued against him, because the act would be a wrong in itself and an indication of an adverse claim by Johnson. But the case is very different when the trustee simply acts in conformity with the express wishes of the *cestui que trust,* and does nothing indicative of an adverse or hostile claim of right. What is said in the authorities referred to certainly has reference only to that class of cases which originate in some wrong, or where there is an open adverse claim of right by the trustee.

In the case of *Strimpfler* v. *Roberts,* (18 Penn. State R. 283) it will be observed the patent appeared to have been taken by one having no right to take it, and hence a right of action accrued at once. That the Court intended to confine the decision to cases of that character is evident from what is said at the conclusion of the opinion.

"Evidence of purchase money," says the Court, "paid by the plaintiff as the groundwork of his title, ought to be regarded by the Court, if the date of the payment be more than twenty-one

years before suit brought, *unless it be accompanied by an offer to* prove such acknowledgment on the part of the warrantor, as will take the case out of the rule here laid down.    What acknowledgments would be sufficient for that purpose, is a point not raised by the record.    When I say that the suit must be brought within twenty-one years from the date of the warrant, I speak of a case like the present one, in which the alleged trust is proved by the naked and solitary fact of the payment of the purchase money. When the *cestui que trust* has superintended the survey and paid the officers' fees, or exercised other acts of ownership over the land, *the presumption in favor of the trustee would, perhaps, not begin* to arise until he did some act of hostility, such as selling his title or taking out a patent to himself."    The concluding portion of what is here quoted seems to sustain the view we have taken of this question, rather than that contended for by respondent.    So in the case of *Pepler* v. *Lodge,* although some expressions are employed which may be construed to sustain the position taken by counsel for respondent, yet it is perfectly evident from the following portion of the opinion, that it was not intended to sanction any such doctrine:    " In England, it is an undoubted rule in cases of express trust, that the possession of the trustee is the possession of the *cestui que trust,* and in that respect I would follow the English practice ; but when the parties *meant to create* no trust, but a trust is raised by operation of law, there is nothing in the mere circumstance of its existence to presume the possession of the trustee to have been otherwise than adverse, the privity or assent of the *cestui que trust* must be shown as in other cases."    But where in this case it is shown that the title was taken by the trustee at the request of the *cestui que trust,* it could hardly be presumed that he held adversely.    Where the trust has been created by some amicable arrangement between the trustee and *cestui que trust,* we can find no case where it has been held that the statute begins to run from the time such trust is created. It will be seen upon examination, that in all such cases the trust arose out of some wrong on the part of the trustee.

That no parol agreement between the parties giving to an implied trust an effect or character different from that which the

law would create from the acts of the parties could be admitted in evidence in cases of this kind there is little doubt, for that would be simply creating an express trust by parol, which the law does not tolerate.   But that all the facts and circumstances out of which the implied trust is raised, may be proven is clear, otherwise the trust itself could not be established.

As a general thing, parol testimony alone can be produced to show that the *cestuis que trust* furnished the money with which property is purchased.   So it must usually be shown that the money was not loaned to the trustee, for from the mere circumstance of money being advanced to another, the law would presume a loan, or payment of a debt.

Hence, the necessity of proving all the circumstances out of which the trust is created.   Nothing more appears to have been done in this case.   It was not attempted to modify the constructive trust by any parol agreement.   The agreement that the plaintiff should have an interest of one-third in the mining ground or the " proceeds if sold," was in no wise a modification of the trust which the law would raise ; for the trustee, may as a general rule not only have the trust enforced against the property immediately acquired with his money, but also against the proceeds if it has been sold before he seeks his remedy.   There would seem to be nothing objectionable, therefore, in the evidence which showed how the property was acquired, and that the deed was taken in the name of Johnson, by the consent and at the request of the plaintiff.

It follows that no cause of action could accrue to the plaintiff in this case, until repudiation of the trust by Johnson or Sheldon, or until some act was done hostile to his right.   We find nothing of the kind proven to have occurred prior to April, 1863, when Sheldon conveyed the mining ground to the corporations known as the Uncle Sam and Baltic Mining Companies, and took stock in his own name in lieu thereof.   This appears to have been an act clearly inconsistent with the plaintiff's right, and at that time his right of action accrued, and not till then.    This suit was commenced in January, A.D. 1867.   Thus a period of less than four years elapsed between the conveyance by Sheldon and the bringing of this action, and the plaintiff's right would not be barred by a lapse

of time short of four years, for this form of action is governed by the eighteenth section of our Act of Limitations. None of the other sections of the Act seem to cover cases of this kind. But it is argued an action for money had and received might have been maintained by the plaintiff at the time the defendant sold the stock, and that in such case a period of two years ought to bar his right. We do not think that such action could be maintained. Had Sheldon acknowledged in any way that any sum was due the plaintiff, perhaps such an action might be maintained, but where, as in this case, it was necessary for the plaintiff to establish facts out of which a trust was created, and then to show that the trust property was converted into money, it is very certain that such facts could not be established in an action brought simply to recover money. The plaintiff could not show himself entitled to any relief whatever until an implied trust was established, which certainly could not be done in a Court of law and in an action of assumpsit; such trust can only be established in an equity proceeding. So, too, this is the only character of action in which the plaintiff could obtain full and adequate relief; hence his right of action should not be barred by the two years' statute. Having brought this action within the period prescribed by the Statute of Limitations, it must be maintained.

Judgment reversed and cause remanded.