[No. 929.]

THE STATE OF NEVADA, APPELLANT, *v.* THE YELLOW JACKET SILVER MINING COMPANY, RESPONDENT.

TAXES—STATUTE OF LIMITATION—REVENUE LAWS.—The revenue laws of this state do not except taxes from the operation of the statute of limitations or extend the time for bringing suits for their collection beyond the period allowed by that statute.

IDEM.—The statute of limitation applies to suits brought by the state for the collection of delinquent taxes.

IDEM—CIVIL PRACTICE ACT—DEMURRER.—The defendant in a suit brought for the collection of delinquent taxes has a right to interpose a demurrer to the complaint upon any of the grounds set forth as a cause of demurrer in the civil practice act.

IDEM.—The provisions of the civil practice act, not inconsistent with the revenue laws, are applicable to suits brought for the collection of taxes.

IDEM—MISJOINDER OF CAUSES OF ACTION.—Taxes due the state on the proceeds of mines for the different quarters of each year, cannot be united in the same cause of action. Every quarterly or yearly tax constitutes a separate and independent liability. (Beatty, C. J., dissenting.)

IDEM—DEBTS—IMPLIED CONTRACTS.—Taxes are not debts in the sense that they are obligations or liabilities arising out of contracts express or implied. They are the enforced proportional contribution of each citizen and of his estate, levied by the authority of the state for the support of the government. They owe their existence to the action of the legislature, and do not depend for their validity or enforcement upon the individual assent of the taxpayer, but operate *in invitum.* (Beatty, C. J., dissenting.)

APPEAL from the District Court of the First Judicial District, Storey county.

The facts appear in the opinion.

*Robert M. Clarke*, for Appellant.

I. The action is properly brought in the name of the state. (2 C. L. Nev. 3261, 3231, 3232; *State ex rel. Drake* v. *Hobart*, 12 Nev. 408, 411; *State* v. *Yellow J. S. M. Co.*, 5 Nev. 416.)

II. The complaint does not improperly unite several and distinct causes of action. The several demands stated in the complaint constitute but one cause of action, and may be united in one complaint. The civil practice act is not applicable to tax suits (2 C. L. 3160; 1 Id. 1667); or if applicable, it is only in a qualified sense. (2 Id. 3160.) The revenue laws prescribe the form of complaint and define which may be pleaded. (2 Id. 3156; *State* v. *C. P. R. R. Co.*, 10 Nev. 47, 61.) No defense can be raised by demurrer which is not allowed by sec. 32, Rev. Laws. (10 Nev. 61.) A tax is not one of the demands mentioned or contemplated by the civil practice act, sec. 64. (C. L. 1127; 1 Van Sant. Pl. 199, 200, 679, 680, 682; *People* v. *Morrill*, 26 Cal. 361; *Wilson* v. *Castro*, 31 Id. 420, 426; *Schultz* v. *Winter*, 7 Nev. 130.) The civil practice act does not restrict, but enlarges the cases in which different causes may be united. (Moaks Van. Plead. 750.) The rule to determine whether there be a misjoinder of causes is the rule of practice in equity. If the claims are of similar nature, involving similar principles and results, and may without inconvenience be heard and adjudicated together, they may be joined. (Moaks' Van. Plead. 750, 751, top; Story's Eq. Plead. 271, b.; Id. 530, 531, 532; 5 Ind. 313; 3d Md. Ch. 48; 9 Iowa, 424; 1 Chitty's Plead. 200.)

This action may be fairly likened to the common counts. For work and labor, for goods sold, for distinct penalties, etc. (1 Chitty's Pl. 200, 201; 16 Cal. 333, 336, 337, 345; 23 Id. 184; 4 Tenn. R. 229; 2 Blackf. 36; 3 Hill, 527; 53 N. H. 581; Hill & Denis, 233.) For tortious breach of duty. (11 Johnson, 479.) For damages and penalty against the sheriff. (*Pearkes* v. *Freer*, 9 Cal. 642.) For the enforcement of several mechanics' liens. (8 Nev. 227,

231.) For the enforcement of several tax liens. (13 Iowa, 17.)

Although a tax is not a debt in the ordinary sense of the term, yet it is so far a debt that in the absence of any specific provision, an action of debt or assumpsit will lie for its recovery. (Cooley on Tax, 13, note 1; 1 Gill & Johns. 502; 2 Dutcher, 400, 404; 39 Iowa, 57, 61; 12 B. Monroe, 77, 80, 81; 2 Nevada, 60, 61; 2 Root Conn.; 3 J. J. Marshall; 19 Wallace, 227, 237.)

Several demands for debt may be united in one action. (1 Chitty's Plead. 200, note 2; 13 Johns. R. 462; 3 Blackf. 167, 168; 18 Pick. 231.)

III. The complaint is not ambiguous. (2 Comp. Laws, sec. 3232; Id. sec. 3214; Stats. 1867, p. 160, sec. 99.)

IV. The statute of limitations does not run against the state in an action to collect a tax. The state is not included unless expressly mentioned. (13 Wall. 92; 28 Miss. 763; 18 Johns. R. 228). The liability mentioned in section 16 is not a tax, because were it so, it would have included the state, etc., before the amendment of 1867. It must be a liability of the same character as contracts or obligations. The tax is a lien upon the defendants' mine and can not be discharged unless paid. (2 Comp. Laws, sec. 3159.) The statute of limitations is not a defense allowed in a tax suit. (2 Comp. Laws, sec. 3156; *State* v. *C. P. R. R. Co.* 10 Nev. 61.) A tax is not a penalty within the meaning of the act of limitations. (16 Cal. 332, 336, 337, 345; 22 Id. 366, 370; 23 Id. 181.)

V. The complaint states a good cause of action. The commissioners had the power to levy fifty cents on the one hundred dollars proceeds. The exception in the act of 1867 is void. (Art. 10 Const. Nevada; 2 Comp. Laws, sec. 3259; Cooley Cons. Lim. 502, 503; 3 Ohio St. Rep. 10, 15, 16; 5 Id. 589, 592; 3 Nev. 179, 180; 9 Wis. 410, 414, 415–423.)

VI. Where part of a statute which is not essential to other parts is unconstitutional, it should be treated as a nullity, leaving the rest of the enactment to stand as valid. (Cooley Cons. Lim. 177, 178; 3 Nev. 180; 8 Id. 342; 22 Cal. 386; 3 Ohio St. 1, 34.)

*Frank V. Drake*, District Attorney of Storey County, also for Appellant.

I. Without express authority therefor the collection of taxes or revenue could not be enforced. (Cooley on Taxation, 13, 300.)

There is but one kind of action known to the revenue laws for the enforcement of the tax. Further, if we are to hold that either act is exclusive, we must hold the revenue laws to exclude the provisions of the code when inconsistent. (Comp. Laws, sec. 3160.) The practice act applies to *others not* the sovereign. (*Savings Bank* v. *U. S.* 19 Wall. 227.) Section 64 of the code is essentially an enlarging statute, not restrictive, and under it a variety of actions may be joined, which are not unitable at common law. (*C. P. R. R. Co.* v. *Dyer et al.*, 1 Sawyer, 641.

II. The action of debt lies where a certain sum of money is to be recovered *in numero*, where debt is due by specialty upon an award for a specific sum, and upon a judgment. (3 Bacon's Abr., title "Debt," 83; Id. 84; *U. S.* v. *Lyman*, 1 Mass. C. C. 482; *Meredith* v. *U. S.*, 13 Peters, 486; *City of Dubuque* v. *I. C. R. R. Co.*, 39 Iowa 56; *Portland D. D. Co.* v. *Trustees*, 12 B. Mon. 77.)

If the sums sued for are a matter of record and determined by a record, or are evidenced in the form of a proceeding under a statute, or are determined in the form of a judgment and the distinguishing feature of a fixed sum due, requiring no future valuation, the action in "debt" lies, and it is immaterial as to the manner in which the obligations were incurred. (3 Sneed, Tenn. 145; 1 Dutcher, N. J. 506; 3 McLean, C. C. 150; 2 A. K. Marsh, Ky. 264; 1 Mass. C. C. 243; 1 Bow. Dict. "Debt," 3.) By the express terms of the statute the "liability" was created at the moment of the levy of the taxes, and upon the first day of each quarter year, a specific sum, ascertainable by computation, became due to the state from the defendant. (*State* v. *Esterbrook*, 3 Nev. 173; *State* v. *W. U. T. Co.* 4 Id. 338.)

If the government does extend its protection and aid to

the citizen for his moneys paid in taxation, and as an equivalent, then the constitution is satisfied *but a contract* is created. (Burroughs on Tax. 253, sec. 105.) A compact creates a contract. (Bouvier's Dict. title "Contract;" Cooley on Tax. 14; Vattel, b. 1, ch. 20; *Bank of U. S* v. *State*, 12 S. &. M. 457; *Rhodes* v. *O'Farrell*, 2 Nev. 60.)

*Whitman & Wood* and *Stone & Hiles*, for Respondent.

I.   The appeal is from a judgment entered against plaintiff on its own motion, so cannot be sustained. *Imley* v. *Beard*, 6 Cal. 666; *Evans* v. *Phillips*, 4 Wheaton, 73; *Vestal* v. *Burditt*, 6 Blackf. 555; 6 Id. 158; *Sleeper* v. *Kelly*, 22 Cal. 456; *Paul* v. *Armstrong*, 1 Nev. 96.

II.   The demurrer was properly sustained by the district court.

The action was barred by the statute of limitation, not having been commenced within three years nor four years, save as to the twenty-first cause, and not as to that within two years, and this whether the tax be considered a debt arising out of contract or not.   (C. L. 1031, 1034.)

Several causes of action were improperly united, as they did not come within statutory allowance of union.   (C. L. 1100 and 1127.) They do not arise out of a contract, express or implied, as taxes are not so based. (Cooley on Taxation, 1; 1 Hilliard on Cont. 5; Hilliard on Tax. 17; Blackwell on Tax Titles, 195, 196; *Phil'a Ass.* v. *Wood*, 39 Pa. St. 73; Opinion of Judges, 58 Me. 591; *Judd* v. *Driver*, 1 Kan. 455; *Mitchell* v. *Williams*, 27 Ind. 62; *Hanson* v. *Vernon*, 27 Iowa, 28; *Loan Ass.* v. *Topeka*, 20 Wall. 664; *Clarke* v. *Nev. & M. Co.*, 6 Nev. 208; *Geren* v. *Gruber*, 26 La. An. 694; *Union Co.* v. *Bordelon*, 7 Id. 193; *Pittsburgh* v. *Commonwealth*, 3 Brews. Eq., Pa. 355; *Delaware* v. *Commonwealth*, 66 Pa. St. 64; *Trenholm* v. *Charleston*, 3 Rich. S. C. 347; *Bradley* v. *McAtee*, 7 Bush, Ky. 667; *Hilbish* v. *Catherman*, 64 Pa. St. 154; *Glasgow* v. *Rowse*, 43 Mo. 479; *City of Carondelet* v. *Picot*, 38 Id. 125; *Johnson* v. *Howard*, 41 Vt. 123; *City of Camden* v. *Allen*, 2 Dutcher, N. J. 398; *Pierce* v. *City of Boston*, 3 Met. 520; *Whiteaker* v.*Haley*, 2 Or. 139; *Mechanics' Bank* v. *Debolt*, 1 O. St. 591; *De Pauw* v. *New*

*Albany*, 22 Ind. 204; *Lane Co.* v. *Oregon*, 7 Wall. 80; *Perry* v. *Washburne*, 20 Cal. 318; *City of Augusta* v. *North*, 57 Me. 392; *Brown* v. *Rice*, 51 Cal. 489; *Dyer* v. *Barstow*, 50 Id. 652.

III. The judgment at bar must stand, if there is any sufficient foundation therefor, even though the district court may have given an erroneous reason for its action. (*Conley* v. *Chedic*, 6 Nev. 222.)

IV. Legally, the state does not appear, as it could only be represented by the district attorney in case of a delinquent tax; and the attorney-general makes no appearance, as, indeed, he could not properly do, the state having no cause of action. (*State of Nevada* v. *C. P. R. R. Co.* 10 Nev. 78.)

V. The legislature has provided but one method for the collection of delinquent taxes; that method is by suit, and it has provided certain methods of procedure which we claim must be followed by the state to the exclusion of all other methods.

VI. The practice act is, conjointly with the revenue laws, applicable to suits for the collection of delinquent taxes. The remedy which the sovereign may pursue in the collection of delinquent taxes rests largely, if not altogether, in the discretion of the sovereign. The remedy may be by suit, or by the arrest of the person taxed, or by distress of goods and chattels, or by taking possession of goods and chattels and retaining them until the taxes are paid, or selling them for payment, or by imposing penalties for non-payment, or by forfeiting to the government the property upon or in respect to which the tax is payable, or by the sale of lands, or by making the payment a condition to the exercise of some lawful right.

Where a statute gives a new right and prescribes a particular remedy, such remedy must be strictly pursued, and is exclusive of any other. It is true, however, that if the right existed at common law, the party may pursue the common law remedy. The statutory one in such cases is regarded as cumulative merely. (*People* v. *Craycroft*, 2 Cal. 243; *Ward* v. *Severance*, 7 Id. 126; *Andover and M. Turnpike*

*Co.* v. *Gould,* 6 Mass. 40; *Dyer* v. *Barstow,* 50 Cal. 652; *Brown* v. *Rice,* 51 Id. 489.)

VII.   The practice act is exclusive of all common law and equity forms and methods of procedure in suits at law and in equity in the courts of this state.   (Pomeroy on Remedies, sections 513, 515; *White* v. *Joy,* 13 N. Y. 90; *People* v. *Ryder,* 12 Id. 438, 439; *Hentsch* v. *Porter,* 10 Cal. 558; *Richards* v. *Edick,* 17 Barb. 262.)

*C. J. Hillyer,* also for Respondent.

By the Court, LEONARD, J.:

This action was commenced on the fourteenth day of January, 1878, to recover certain taxes (including penalties for non-payment as required by law) upon the proceeds of respondent's mine, alleged to be due and delinquent for twenty-one quarter years, the first quarter commencing July 1, 1867, and the twentieth, July 1, 1872, while the twenty-first quarter commenced October 1, 1875, and ended December 31, 1875.

The complaint contains twenty-one counts, each being called a cause of action, and in each count all the facts required by the statutory form of complaint in tax suits are alleged.   It is also alleged that a part of each of the twenty-one quarters' taxes has been paid by defendant, the Yellow Jacket Silver Mining Company, but that it has neglected and refused to pay the balance of the same, and that, in the aggregate, there is due from defendants to plaintiff on account of, and by reason of, the several levies of taxes, and of the several delinquencies and penalties, the full sum of fifty-nine thousand seven hundred and sixty-nine dollars and forty-one cents, in United States gold coin.

Judgment is asked against the Yellow Jacket Silver Mining Company for the amount claimed, and separate judgment against its mine described for the same sum, and that a decree be entered adjudging said taxes and penalties for the several quarters stated, to be liens upon the said mine or mining claim.

The defendant, the Yellow Jacket Silver Mining Com-

pany, is a corporation organized and existing under and by virtue of the laws of this state, and has been such corporation since the first day of January, 1865; and its mine, described in the complaint and made a defendant therein, the proceeds of which it is alleged were taxed and assessed, is situate in Gold Hill mining district, Storey county, Nevada. It appears also from the transcript, and it was so stated at the oral argument, that similar actions were brought to recover back taxes, etc., against the Savage Mining Company, the Belcher Silver Mining Company, the Consolidated Virginia Mining Company, the Hale and Norcross Silver Mining Company, the Crown Point Gold and Silver Mining Company, the Ophir Silver Mining Company, the Kentuck Mining Company, the Chollar-Potosi Mining Company, and the Sierra Nevada Mining Company, together with the mining claim of each. A part or all of the defendants last named are foreign corporations, but the mining claim of each is situate in Storey county, Nevada.

To the complaint filed in each case, a demurrer was interposed, similar, as we understand, to the one filed in this case, and they were each and all sustained by the court. The state refused to amend, and judgments were entered for the respective defendants. Both parties desire the decision in this case to cover all those mentioned above; that is to say: We are asked to decide whether or not the demurrer herein was properly sustained, and to have the decision embrace so many of the grounds of demurrer stated as may be necessary in order that our conclusions may be decisive of the other cases mentioned, as well as this.

Among others, defendants demurred upon the following grounds:

1. That each, every, and all the causes of action stated in the complaint, were barred by the statute of limitations of this state.

2. That several causes of action had been improperly united in the complaint.

3. That the complaint did not state facts sufficient to constitute a cause of action.

If we mistake not, the other grounds of demurrer need not be stated or considered.

And first, the Yellow Jacket Silver Mining Company being a domestic corporation, and its mine described in the complaint being situate in this state, are all or any of the causes of action stated in the complaint barred by the statute of limitations?

I. During the whole period stated in the complaint, taxes on the proceeds of mines became delinquent as follows: For quarters commencing January 1st and ending March 31st, on the fourth Monday in June following; for quarters commencing April 1st and ending June 30th, on the fourth Monday in September following; for quarters commencing July 1st and ending September 30th, on the fourth Monday in December following; for quarters commencing October 1st and ending December 31st, on the fourth Monday in March following. (C. L. 3221.) Within three days after the fourth Monday in June, September, December, and March of each year, it became the county auditor's duty to deliver the delinquent list, then in his hands, to the district attorney, whose duty it was, immediately to commence action, in the name of the state, against the person, firm, incorporated company, or association so delinquent, and against the mines or mining claims from which the gold and silver-bearing ores, quartz or minerals were extracted and assessed, so delinquent. (C. L. 3230, 3231.) The result, therefore, is, that all the taxes alleged to be due in this case, except those stated in the twenty-first cause of action, were delinquent on or before the fourth Monday in December, 1872, and that a cause of action accrued as to each quarter's taxes within three days at least, after the same became delinquent; that the amount alleged to be due in the twenty-first cause of action (twenty-four dollars and twenty-three cents) became delinquent on the fourth Monday in March, 1876.

The statutes of this state provide as follows: "Civil actions can only be commenced within the periods prescribed in this act, after the cause of action shall have accrued, except where a different limitation is prescribed

by statute." (C. L. 1016.) * * * "Actions other than those for the recovery of real property can only be commenced as follows: Within three years—First, an action upon a liability created by statute other than a penalty or forfeiture. * * * Within two years—First, an action upon a contract, obligation or liability not founded upon an instrument of writing. * * * Fifth, an action upon a statute for a forfeiture or penalty to the state." (C. L. 1031.) "An action for relief, not hereinbefore provided for, must be commenced within four years after the cause of action shall have accrued." (C. L. 1033.)

"The limitations prescribed in this act shall apply to actions brought in the name of the state, or for the benefit of the state, in the same manner as to actions by private parties." (C. L. 1034.)

In our opinion, under the provisions of the statutes quoted, all the causes of action contained in the complaint in this case, with the exception of the last, are barred. Nor is it necessary to decide that they are included within any of the subdivisions of section 1031, in order to be driven to such conclusion. If they are not embraced within that section, they certainly must be covered by sections 1033 and 1034.

That the common law maxim, "*nullum tempus occurrit regi*," does not apply to, and has not been in force in, this state since the adoption of section 1034 in 1867, is too plain for argument. That the legislature had the power to include the state within the provisions of the statute of limitations is not questioned. In *The United States* v. *Hoar*, 2 Mason, C. C. R. 312, Mr. Justice Story says: "It may be laid down as a safe proposition that no statute of limitations has been held to apply to actions brought by the crown, unless there has been an express provision including it."

"Limitations are created by, and derive their authority from, statute." (*People* v. *Gilbert*, 18 Johns. 227.)

In *The People* v. *The Supervisors of the County of Columbia*, 10 Wend. 365, the court says: "By the revised statutes (2 R. S. 295–97, sec. 18–28) the same limitations of actions apply to the people of the state as to individuals.

\*   \*   \* If the state neglects to prosecute for the period which protects individual claims, it loses the demand in the same manner as individuals do."

"Our statute of limitations embraces all characters of actions, both legal and equitable." (*White* v. *Sheldon*, 4 Nev. 288.) And it may be added, that it embraces every civil action, both legal and equitable, whether brought by an individual or the state; and if the cause of action is not particularly specified elsewhere in the statute, it is embraced in section 1033, and the action must be commenced within four years after the cause of action accrued. Such is the plain reading of the statute and the evident intention of the legislature. In many other states besides this the state is limited, the same as individuals. So it is in New York, Massachusetts, and California.

It is urged by counsel for plaintiff that the statute has not run against any or all of the causes of action stated, because the revenue laws provide that a lien shall attach upon the mine, "which shall not be satisfied or removed until all taxes are paid, or the title to the mine has absolutely vested in a purchaser under a sale for the taxes levied on the proceeds thereof." (C. L. 3156, 3250.)

The revenue law of 1861, as well as that of 1865, created a lien upon the real property of the person assessed, to secure payment of the taxes due from such person. During that period, and until 1867, the statute of limitations did not run against actions for delinquent taxes, because, until the last-mentioned date, the state was not, by express provision, included by that statute. But in 1867, when the statute creating and continuing the lien was in force, the legislature declared that the statute of limitations should apply to actions brought in the name of the state, or for the benefit of the state, in the same manner as to actions by private parties. That statute must apply to tax suits unless they are excluded from its operations by some other statute. The only ones claimed to have that effect are those mentioned, creating and continuing the lien, passed both before and after section 1034. (See C. L. 3250; statute 1867, 164; statute 1871, 89; statute 1873, 96.)

The question presented then, is this: "Do the several statutes just mentioned, either except taxes from the operation of the statute of limitations, or extend the time for bringing suits for their collection beyond the period allowed by that statute? They are substantially as follows: "Every tax levied under the authority or provisions of this act, on the proceeds of mines, is hereby made a lien on the mines or mining claims from which ores or minerals bearing gold and silver, or either, or any other valuable metal, is extracted for reduction, which liens shall attach on the first days of January, April, July and October of each year, for the quarter-year commencing on those days respectively; and shall not be satisfied or removed until the taxes, as provided in this act, on the proceeds of mines, are all paid, or the title to said mines or mining claims has absolutely vested in a purchaser, under a sale for the taxes levied on the proceeds of such mines or mining claims." (C. L. 3250.)

All that can be claimed under the statute quoted is, that the lien created continues indefinitely, or until the tax is paid, or the property is sold under tax sale. Does that fact establish what is claimed, that the remedy to enforce collection by suit is not barred?

The revenue laws have given two remedies to enforce by action the collection of delinquent taxes, one against the person and the other against the property, and neither depends upon the other for its existence or efficiency. (*O'Grady* v. *Barnhisel*, 23 Cal. 294.)

A personal judgment may be given in a proper case, and also a separate judgment against the property. Upon such judgments executions may issue as in other civil cases. A lien is also created, the effect of which is to subject the property to the payment of the tax, although it may have passed into other hands subsequent to the date of the lien. But in order to obtain a judgment against the personal defendant, or against the property, or to enforce the lien, an action like the one we have in hand must be brought; that is the remedy provided by statute if the taxes are not voluntarily paid. It is the only remedy permitted except the summary one mentioned in section 3222.

The lien cannot be enforced, the property can not be sold, without the aid of the remedy provided—that is, by suit; and if that is barred, the remedy is lost, although the right may remain, as in other cases. The creation of a lien upon the mine certainly could not prevent the operation of the statute as to the other defendant, the Yellow Jacket Silver Mining Company. A lien is only security, whether it be given by statute, judgment, mortgage or pledge. A mortgage may be given to secure the payment of an account. The statute would run against the latter in three years and the former in six. The mortgagee has two remedies, one upon the debt and the other upon the mortgage. If he postpones suit until after the statute has run against the debt, he may still forecloso his mortgage within the six years, but he can have no personal judgment against the mortgagor for any deficiency. So, in this case, should it be admitted that plaintiff can sustain an action to enforce the lien created by statute, still it has lost its personal remedy. We could not arrive at any other conclusion without doing violence to a plain expression of the legislative will. But has not plaintiff lost its remedy as to the property also? Appellant says no; because the statute provides that the lien shall continue until the tax is paid. Suppose it does. It is common learning, that a lien may continue after the remedy for its enforcement is lost. A mortgage debt is not destroyed or extinguished by the statute of limitations. The remedy only is taken away. (*McCormick* v. *Brown*, 36 Cal. 180; *Sichel* v. *Carrillo*, 42 Id. 493.)

"The statute does not destroy the right, but only bars the remedy. Hence, if the claimant has any means of enforcing his claim, other than by action or suit, the statute can not be set up to prevent his recovering by such means." (Darby and Bosanquet on Stat. Lim. 10.)

"An action of assumpsit by a pawnee, to recover a simple contract debt, is not the more protected from the operation of the statute because accompanied with property pledged as collateral security; for it is not, on that account, less subject to the mischief against which the statute was

intended to guard.    But though it be clear in such case
that the remedy to enforce the debt may be barred, yet
the lien upon the property pledged will remain." (Angell
on Lim. sec. 73; see, also, *Henry* v. *The Confidence Com-
pany*, 1 Nev. 621.)

It is plain to our minds that the creation and continua-
tion of a lien did not extend the time for bringing tax suits,
beyond the period allowed by the statute of limitations,
nor did it exempt taxes from the operation of the statute,
either as to the corporation defendant or the property.
Had the statute created the lien without providing for its
continuance until the tax should be paid, the result would
have been the same—the lien would have continued when
once created until payment, or until the repeal of the
statute creating it.

The Massachusetts tax act of 1824 provided as follows:
" Whenever a tax shall be assessed on any real estate liable
to taxation, said tax shall be a lien on said estate," etc.    It
did not, in terms, provide for a continuance of the lien, but
the court said in *Hayden* v. *Foster*, 13 Pick. 495, " Nor do
we entertain a doubt that such lien continues until the tax
is paid."

This, then, is our case upon the question under discussion.
A statutory lien is created, which still exists, but which
cannot be enforced, nor can judgment be obtained against
either of the defendants, without this or a similar action,
which is barred by the statute.

Counsel for appellant also claim, that the statute of lim-
itations is not a defense allowed in tax suits, and that no
defense can be raised by demurrer, which is not permissible
by answer under section 3156.

We said, a few days ago, in the case of *The State ex rel.
Lake* v. *The Board of County Commissioners of Washoe County*,
that " the concluding sentence of that section (3156), 'and
no other answer shall be permitted,' must be understood
with this qualification: that it does not exclude the direct
denial of any allegation of the complaint, necessary to be
proved, in order to entitle the state to recover."

No more does it prohibit raising the issue of law, that

admitting the facts stated, plaintiff cannot maintain its action. If the plaintiff does not state a cause of action in its complaint, or if it states facts which, if not waived, are a bar to the action, the defendant may protect himself by proper pleading, as in other cases. Indeed, it is difficult to perceive why the defendant may not demur for any of the reasons stated in the civil practice act. As will be seen further on, the civil practice act is made applicable to tax suits, so far as it is consistent with the revenue law, and there is nothing in the law last named inconsistent with the practice act in relation to demurrers, unless it be section 3156.

It is evident that that section does not refer to demurrers. Its opening sentence is: "The defendant may answer, which answer shall be verified." It refers only to a pleading which contains denials or averments of facts constituting a defense to the matters of fact alleged in the complaint. Who can say there is not the same necessity for interposing a demurrer in a tax suit as any other? If the complaint does not state facts sufficient to constitute a cause of action, there is nothing to try. If it is ambiguous, unintelligible or uncertain, it should be made plain. If the court has no jurisdiction of the person of the defendant, or of the subject of the action, it cannot proceed with the case. If it appears upon the face of the complaint that the action is barred, no cause of action is stated, if the defendant interposes the proper plea. Before the defendant can be required to answer in a tax suit, or any other, a valid, subsisting cause of action must be alleged against him. Besides, the law making the statute of limitations applicable in actions brought by the state, the same as in actions by private parties, was passed two years subsequent to section 3156 of the compiled laws, and is, consequently, the controlling statute, so far as this defense is concerned. The demurrer to the twenty causes of action first stated was properly sustained as to both defendants, for the reason that they were barred by the statute of limitations. The twenty-first cause of action was not barred, but the court below had no original jurisdiction, and this court has no

appellate jurisdiction, over a case involving the amount therein claimed.

II. Have several causes of action been improperly united in the complaint?

Although this question was argued with signal ability by counsel on both sides, still we find it full of difficulties. It will be our endeavor to so construe the different statutes touching this question, that our conclusion will harmonize with reason and the majority of adjudicated cases.

As we have seen, the revenue law makes it the duty of the district attorney to bring suit immediately after receiving the delinquent list of each quarter; and the only provision made by that law in relation to the complaint, or what it may or shall contain, is found in sections 3232 and 3160, C. L.

The first section mentioned prescribes the form that may be used for one quarter's taxes only, and neither that section nor any other, in terms, provides or intimates that more than one quarter's taxes may be enforced in the same action. In other words, the revenue law is silent upon the question, with the exception of section 3160.

That section provides as follows: "An act to regulate proceedings in civil cases in the courts of justice in the state of Nevada, approved November 29, 1861, and the several amendments thereto, or amendments which may hereafter be made thereto, or laws passed under the government of the state of Nevada, so far as the same are not inconsistent with the provisions of this act, are hereby made applicable to the proceedings under this act."

It is plain that the only test as to whether any portion of the civil practice act of 1861 was made applicable to proceedings in tax suits, brought under the revenue law, is whether or not such portion was *inconsistent* with the provisions of the revenue law. If any section of the former act is consistent with all the provisions of the latter, it must be considered and followed with the same particularity as though it was included in the body of the revenue law. It is common for legislatures to refer to other statutes, as was done in this case, and by such reference only, to desig-

nate the powers given under the latter act. When that is done without limitation, the statute referred to is to be considered as incorporated in the one making the reference. (*Turner* v. *Wilton et al.*, 36 Ill. 393.) If the operation of the statute referred to is limited by the act making the reference, then the former is considered as incorporated in the latter, with the limitations mentioned. The legislature must have had some object in view in making all consistent provisions of the practice act applicable to the revenue law. In 1861, a revenue law was passed and approved, November 29th. In its principal features it was similar to the revenue law of 1865. The revenue law of 1861 and the practice act of 1861 were both approved on the same day, and the latter was made applicable to the former, so far as it was consistent.

The legislature knew that no provision had been made in the revenue law as to many necessary points or matters of pleading and practice. They knew, also, that it was not desirable to adopt a new system for the collection of delinquent taxes, except so far as circumstances rendered such change necessary. The legislature, therefore, with the best of reasons, made the practice act the controlling law in tax suits as much as it was in other civil cases, except when inconsistent with the provisions of the revenue law. We have no doubt that the legislature intended to make the civil practice act of 1861 applicable as stated; nor have we any doubt that the civil practice act of 1869, now in force, is applicable to the same extent. Such would probably have been the effect had the practice act of 1861 only, been referred to and made applicable to the revenue law of 1865. (*Kugler's Appeal*, 55 Pa. St. 125; *McKnight* v. *Crinnion*, 22 Mo. 560.)

But the revenue law now in force (C. L. 3160), not only made the civil practice act of 1861, then in force, applicable, but also its several amendments, or amendments which might thereafter be made thereto, or laws passed under the government of the state of Nevada, so far as consistent. The apparent intention was to make the civil practice act

in force at the time a tax suit should be brought, applicable, unless inconsistent with the revenue law.

Nothing need be said in addition to what is expressed in the first portion of this opinion, in relation to defendant's right to demur upon the ground of misjoinder of causes of action. There is nothing in the revenue law against it, directly or indirectly, and the civil practice act permits it. Besides, every conceivable reason favors such a proceeding in tax suits as well as in others. The fortieth section of the practice act is not inconsistent with the revenue law, and in tax suits any ground of demurrer therein stated may be urged. The same conclusion must follow in relation to section 64. It is not inconsistent with any of the provisions of the revenue law. That section provides that "the plaintiff may unite several causes of action in the same complaint, when they all arise out of: First—Contracts, express or implied; * * * But the causes of action so united shall all belong to only one of these classes, and shall affect all the parties to the action, and not require different places of trial, and shall be separately stated."

If the different quarters' taxes are separate and distinct causes of action, and if it shall be found that no other causes of action can be united in one complaint, than those permitted by section 64, it is not contended that those united in the complaint in this case can be so joined, unless they are embraced in the first subdivision quoted—that is, unless a tax upon the proceeds of mines is a debt or liability arising out of an express or implied contract.

The question, then, that now presents itself is this: Although section 64 is applicable to tax suits, can any other causes of action be united, except those specified therein? Does the express permission to unite those stated in that section prohibit the union of others not mentioned therein, which, under the old equity practice, could have been joined in the same complaint? Is our code "the only source of authority from which rules of pleading may be drawn, and have its methods so completely supplanted those which preceded it that the latter can no longer be appealed to as possessing of themselves any force and authority?"

The practice act now in force is entitled, "An act to regulate proceedings in civil cases in the courts of justice of this state, and to repeal all other acts in relation thereto."

Section 1 declares that "there shall be in this state but one form of civil action for the enforcement or protection of private rights, and the redress or prevention of private wrongs."

Section 37 provides that "all the forms of pleading in civil actions, and the rules by which the sufficiency of the pleadings shall be determined, shall be those prescribed in this act."

By section 38 it is provided that "the only pleadings on the part of the plaintiff shall be the complaint or demurrer to the defendant's answer; and the only pleadings on the part of the defendant shall be the demurrer or the answer."

It seems to us that sections 37 and 38, when construed together, plainly mean this and nothing more: That the complaint, answer and demurrer are sufficient, when they square with the rules prescribed by the civil practice act, and not otherwise. We think, also, that the provision in section 37, that "the rules by which the sufficiency of pleadings shall be determined shall be those prescribed in this act," exclude the consideration of other rules. It is said that "a statute containing a mere affirmative provision, without any negative, expressed or implied, does not alter any common law rule existing in regard to its subject matter before the statute." (Sedgwick on the Construction of Stat. and Const. Law, 29.) But there is, in section 37, a plainly implied negative. (7 Iowa, 276; 36 Conn. 375; 20 Ark. 420.) Let us test the conclusion at which we have arrived by some provisions of the practice act.

Section 29 declares what, in general terms, the complaint shall contain, whether legal or equitable relief, or both, are claimed. Section 40 provides within what time and upon what grounds the defendant may demur to the complaint. Seven grounds of demurrer are stated. No one would argue that a demurrer can be interposed in this state for any other reason than those stated. Even Mr. Moak, in his Van Santvoord's Pleadings, says on page 750:

"The first of these, that is, the misjoinder of claims or causes of action between the same parties, is specifically provided for in the seven several subdivisions of section 167 of the code as amended. And here the remark made in · *Manchester* v. *Storrs* (3 How. Pr. 410), in respect to a demurrer for the misjoinder of several causes of action, may be repeated; that 'we must forget all rules respecting demurrers, and regard a demurrer now as a pleading created, with its character and office defined by the code. No demurrer will lie except to a complaint, nor for any other causes except the six grounds specified in section 122, now 144.'" And yet he holds that causes of action not mentioned in the practice act may be united, if they are such as might have been joined under the former equity practice.

We do not perceive why a different rule should obtain in relation to demurrers from that concerning joinder of different causes of action. The language of the code is the same in both cases. "The defendant may demur," etc. (Sec. 40.) "The plaintiff may unite several causes of action in the same complaint, when they arise out of," etc. (Sec. 64.) If the conclusion arrived at by the author is based upon the fact that "there are remedies, well known to our jurisprudence, which still exist, and which can not be comprised in either of the subdivisions of section 167" (corresponding with section 64), as seems to be the case, then why not be consistent, and arrive at the same conclusion in relation to demurrers? It is well known that the code does not specify all the grounds of demurrer that were known and permitted before the code.

In *White* v. *Joy*, 13 N..Y. 89, the court said: "Departure in pleading is defined to be, when a party quits or departs from the cause or defense which he has first made, and has recourse to another. * * * Prior to the code, a demurrer would lie for a departure in pleading; but is a demurrer authorized by the code for such fault in pleading? * * * It is proper to remark, that since the code, parties must find their authority for pleading in the code, and if the authority is not found there for any pleading put in, and it is not a case where a demurrer is authorized, the

remedy is by motion to strike out. It is an irregularity to put in pleadings not authorized by the code. All the casés in which a demurrer may be interposed are clearly specified." Without quoting, we refer especially in this connection to *Dyer* v. *Barstow*, 50 Cal. 562, and *Brown* v. *Rice*, 51 Cal. 489.

So, examining the statute outside of pleadings, who would say that an injunction, certiorari or mandamus can be granted, except for the reasons stated in the practice act; or that a new trial can be had except upon grounds therein stated? Who would think of taking an appeal except in the cases prescribed in title nine? And is any other act or omission a contempt, save those mentioned in section 460?

We shall make two brief quotations in addition to the foregoing, and close this branch of the case: "There is no intermingling of a former practice where the provisions of the code are specific. The whole plan of prosecuting appeals and reserving questions is contained in their (New York) code, and there only. All the former machinery, cumbrous and elaborate as it was, far more so than our own, is entirely superseded by the code. Any legal gentleman in that state, who should adhere to the old practice, setting it up against the new, would only make himself ridiculous. So in this state. Wherever the code has made affirmative provisions, the former practice is obsolete. The only thing which looks to keeping alive the old practice, is that one provision already alluded to, of very doubtful constitutional validity, which provides for omitted cases. Everything else has fallen before the express and detailed provisions of the code. This is the last expressed will of the legislature, and on the plainest principles of statutory construction, as well as in express terms, it abrogates everything in the former practice, and all enactments inconsistent with it." (*Jolly* v. *Terre Haute Drawbridge Co.*, 9 Ind. 427.)

We quote also from Mr. Pomeroy's excellent work on "Remedies and Remedial Rights," p. 545. He says: "Before entering upon the matter thus outlined, a preliminary question presents itself, upon the answer to which much of the succeeding discussion must turn. The question involves the true relations between the doctrines and rules of plead-

ing enacted by the codes and those which existed previously, as parts of the common law and the equity jurisprudence, and may be stated as follows: Are the doctrines and rules contained in the statute to be regarded as the sole guides in pleading under the reformed procedure? or are the ancient methods still controlling, except when inconsistent with some express provisions of the later legislation?" And after stating the views of different courts, etc., he concludes as follows: " During the earlier periods of the present system, there was an evident disposition on the part of some judges and courts to adopt the former of these two views, and to hold that the old methods, rules and requisites of the common law and of equity are still applicable in substance, when not inconsistent with the provisions of the statute; or, in other words, that they had been supplanted only so far as such inconsistency extends. The second theory has, however, been generally, if not universally, adopted, as the true interpretation to put upon the language of the codes, and as the starting point in the work of constructing a system of practical rules for pleading. The proposition, as stated in the foregoing paragraph, has been expressly announced in well-considered judgments; in the vast majority of instances, however, it has rather been assumed and impliedly contained in the decision of the court, yet none the less passed upon and affirmed. It may now, I think, be regarded as the established doctrine, that the code in each of the states is the only source of authority from which rules of pleading may be drawn; that its methods have completely supplanted those which preceded it, so that the latter can no longer be appealed to as possessing of themselves any force and authority."

In our opinion it is wisdom to preserve the plain, simple methods and rules of the code, in pleading and practice; and if section 64, or any other, does not, in terms, embrace all that is desirable, then let us appeal to the legislature for aid, rather than to judicial legislation. It is proper to refer briefly to certain authorities to which our attention has been called in this connection.

*Bowers* v. *Keesecher*, 9 Iowa, 424, and *Byington* v. *Woods*,

13 Id. 20, were decided under statutes justifying the conclusions of the court, but by reason of the great difference between those statutes and ours they throw no light upon this case. (See Laws of Iowa, revision of 1860, and 13 Id. 20.

*People* v. *Seymour*, 16 Cal. 340, was brought under a special statute legalizing the assessments of taxes in the city and county of Sacramento for the years 1858 and 1859, and authorizing their collection.

*People* v. *Todd*, was a similar action, brought to recover taxes for 1858, 1859 and 1860, under a similar statute.

It is not necessary to decide whether by those statutes it was the evident intention of the legislature to permit taxes against the same person and the same property for the different years, to be collected in the same suit, because the question here presented was not in any manner raised or suggested in either of those cases. So, in any event, they are not authority in this case upon the question of misjoinder of causes of action.

*Deyo* v. *Rood*, 3 Hill, 528, was decided in 1842, before the adoption of the code, and the decision was placed expressly upon the common-law doctrine allowing several penalties to be recovered in the same suit. The same is true of *City of Brooklyn* v. *Cleves*, *Hill & Denio*, 233, and *Church* v. *Mumford*, 11 Johns. 479.

*Kempton* v. *Savings Institution*, 53 N. H. 583, was brought under a penal statute which provided that "if any person upon any contract receives interest at a higher rate than six per cent. he shall forfeit three times the sum so received in excess of said six per cent. to the person who will sue therefor." The question before the court was whether that statute authorized a separate suit for every separate reception of usurious interest on the same contract. And the statute having been penal, and hence its operation and effect could not be extended by implication, and the court being of the opinion that the statute did not, in terms, authorize a separate suit for each breach any more than that the whole must be included in one suit, it was deemed the best policy to resolve the doubt according to the well-

·established doctrine, that "the law does not favor or encourage a multiplicity of suits."

· Pearkes v. Freer, 9 Cal. 642, was an action against a ·sheriff to recover damages sustained by reason of his failure to execute and return process, with the addition of two hundred dollars imposed by law as a penalty for such neglect. The statute provided that for such failure the sheriff should "be liable in an action to the party aggrieved for the sum of two hundred dollars, and for all damages sustained by him." A demurrer was interposed to the complaint on the ground that two distinct causes of action had ·been improperly united. The court said: "It is not the policy of the law to promote multiplicity of actions, and by no rule of construction of which we have any knowledge can we arrive at the conclusion that the legislature intended that two suits were necessary to enable a party to avail himself of the remedy given by this statute."

' The fact is, that although there were two kinds of relief, there was but one cause of action. (Pomeroy's Remedies, · 486, et seq.)

We are also referred to Skyrme v. Occidental Co. (8 Nev. 231), an action to enforce several mechanics' liens. The court in that case said: "The plaintiff need not have brought suit to foreclose any but his own lien, and then, by pursuing the provisions of the statute, would have had the right to exhibit proofs as to the others. * * * But by bringing suit upon all the liens (doing more than was necessary) he did not, in our judgment, lose the right to have the assigned liens enforced." (See, also, Hunter & Co. v. Truckee Lodge, decided at the last January term, and Ivers v. Elliott, 6 Nev. 290.)

But it is argued by counsel for appellant:

1. That there is in fact but one cause of action stated in the complaint, although the different quarters' taxes and ·penalties are set out as distinct causes.

2. That if there are as many separate and distinct causes of action as there are delinquencies stated in the complaint, still a tax is in the nature of a debt, and those al-

leged to be due in this case can all be recovered in one
action.

If the complaint contains but a single cause of action,
whatever else it may contain, we are of the opinion that the
defendants cannot successfully demur on the ground that
several causes of action have been improperly united.
(*Hillman* v. *Hillman,* 14 How. Pr. 459.)

In *Mayer* v. *Van Collem* (28 Barb. 231), a cause of action
is defined to be "the right which a party has to institute
and carry through a proceeding for the enforcement or
protection of a right, the redress or prevention of a wrong."
"The complaint states the facts showing this right. The
unity of the right to be enforced, or of the wrong to be
redressed, constitutes the unity of the action." (Id.) Mr.
Pomeroy says: "Every action is based upon some pri-
mary right by the plaintiff, and upon a duty resting upon
the defendant corresponding to such right. By means of
a wrongful act or omission of the defendant, this primary
right and this duty are invaded and broken; and there im-
mediately arises from the breach a new remedial right of
the plaintiff and a new remedial duty of the defendant.
Finally, such remedial right and duty are consummated
and satisfied by the remedy which is obtained through
means of the action and which is its object. * * * * *
The cause of action, therefore, must always consist of
two factors: 1. The plaintiff's primary right and the de-
fendant's corresponding primary duty, whatever be the sub-
ject to which they relate, person, character, property or
contract. 2. The delict, or wrongful act or omission of
the defendant by which the primary right and duty have
been violated. Every action, when analyzed, will be found to
contain these two separate and distinct elements, and, in
combination, they constitute the cause of action." (Sec.
519.)

The two combined elements in this case, then, were (1)
the state's right to a quarterly payment of taxes alleged to
be due, and the defendant's duty to pay the same at the
times provided by law; and (2) the omission to pay when
required. The combined elements necessary to constitute

a cause of action existed as to each quarter's taxes as soon as the auditor handed over to the district attorney the delinquent list for such quarter. At that time, then, the state had a cause of action, and the right to bring it. If the statute of limitations had not barred an action for any part of the taxes alleged to be due, and if the state had obtained judgment in an action brought to recover the amount claimed to be due for the last quarter only, would such judgment be a bar to an action or actions for the recovery of amounts alleged to be due for the preceding quarters? If such judgment for a part would bar an action for any or all taxes claimed for previous quarters, then only one cause of action is stated in the complaint. On the contrary, if such judgment would not be a bar, then there are twenty-one causes of action stated in the complaint.

"The principle is settled beyond dispute that a judgment concludes the rights of the parties in respect to the cause of action stated in the pleadings on which it is rendered, whether the suit embraces the whole or only a part of the demand constituting the cause of action. It results from this principle, and the rule is fully established, that an entire claim, arising either upon a contract or from a wrong, cannot be divided and made the subject of several suits; and if several suits be brought for different parts of such a claim, the pendency of the first may be pleaded in abatement of the others, and a judgment upon the merits in either will be available as a bar in the other suits. * * * But it is entire claims only which cannot be divided within this rule—those which are single and indivisible in their nature. The cause of action in the different suits must be the same. The rule does not prevent, nor is there any principle which precludes, the prosecution of several actions upon several causes of action. The holder of several promissory notes may maintain an action on each; a party upon whose person or property successive distinct trespasses have been committed, may bring a separate suit for every trespass; and all demands, of whatever nature, arising out of separate and distinct transactions, may be sued upon separately. It makes no difference that the causes of

action might be united in a single suit; the right of the
party in whose favor they exist, to separate suits, is not
affected by that circumstance, except in proper cases, for
the prevention of vexation and oppression, the court will
enforce a consolidation of the actions.  *  *  *  The true
distinction between demands or rights of action, which are
single and entire, and those which are several and distinct,
is, that the former immediately arise out of one and the
same act or contract, and the latter out of different acts or
contracts.  Perhaps as simple and safe a test as the subject
admits of, by which to determine whether a case belongs
to one class or the other, is by inquiring whether it rests
upon one or several acts or agreements.  In the case of
torts, each trespass or conversion, or fraud, gives a right of
action, and but a single one, however numerous the items
of wrong or damage may be; in respect to contracts,
express or implied, each contract affords one, and only one,
cause of action.  The case of a contract containing several
stipulations to be performed at different times is no excep-
tion.  Although an action may be maintained upon each
stipulation as it is broken, before the time of performance
of the others, the ground of action is the stipulation, which
is in the nature of a several contract.  Where there is an
account for goods sold, or labor performed; where money
has been lent to, or paid for, the use of a party at different
times, or several items of claim spring in any way from con-
tract, whether one only or separate rights of action exist,
will, in each case, depend upon whether the case is covered
by one or by separate contracts.  The several items may
have their origin in one contract, as on an agreement to sell
and deliver goods, or perform work, or advance money; and
usually, in case of a running account, it may be fairly im-
plied that it is in pursuance of an agreement that an
account may be opened and continued, either for a definite
period or at the pleasure of one or both parties.  But there
must be either an express contract, or the circumstances
must be such as to raise an implied contract, embracing all
the items, to make them, where they arise at different
times, a single or entire demand or cause of action."

(*Secor* v. *Sturgis*, 16 N. Y. 554–558, and cases there cited.). We know of no plainer condensed statement of the law upon the subject in hand than the above. (See *Staples* v. *Goodrich*, 21 Barb. 317; *The Erie & New York City R. R.* v. *Patrick*, 2 Keyes, 256; *Secor* v. *Sturgis*, 2 Abb. Pr. 70; *Cashman* v. *Bean*, 2 Hilt. 341; *Reformed Protestant Dutch Church* v. *Brown*, 54 Barb. 199; *Boyce* v. *Christy*, 47. Mo. 72.)

It is true that one law is the sole authority for the different acts required in tax matters. That law creates liabilities, but it also requires the performance of certain acts in a specific way before payment can be enforced. A valid assessment is an indispensable basis for the support of a. tax. On real and personal property an annual levy is made by the law for state purposes, and by the county commissioners for county purposes. The methods are different, but the result, in both cases, is a yearly levy, and each levy is separate from that of any other year. So it is as to assessments. Each is and must be an assessment for one year only. (*People* v. *Hastings*, 29 Cal. 452.) Separate tax lists,. tax rolls and delinquent lists are required and kept for each year. Each lien created is a lien for that year's taxes, and. suits can be, and under the law should be, brought inde-. pendently of suits for the taxes of other years.

There is no provision allowing delinquent taxes of one year to be added, or attached, to those of another year.. Any errors in one year's assessment, levy, or other act required, does not affect the collection for any other year., Each year a lien attaches upon the real property assessed, for the tax levied upon the personal property of the owner, of such real estate, but only for that year. Each delinquent list, or a copy thereof, certified by the county auditor, showing unpaid taxes against any person or property, is *prima facie* evidence in any court to prove the assessment, property assessed, and that all the forms of law in relation to the assessment and levy of such taxes have been complied with. Hence different evidence is necessary to. support an action for each year's taxes.

" Where the act complained of is indivisible, a plaintiff

cannot separate it and bring one action for one part and another for another; and the test by which to determine whether causes of action are the same is to inquire whether the same evidence will be necessary to support them." (*Crips* v. *Talvande*, 4 McCord (S. C.), 20.)

What has been said in relation to real and personal property is entirely applicable to the proceeds of mines, with this difference: In the first instance, as well as in the second, the levy is made yearly, but after the levy, the different acts in relation to proceeds of mines are required to be done quarterly. It must be admitted that if taxes upon the proceeds of mines for different quarters constitute but one single cause of action, then those upon real and personal property, for different years, must fall under the same rule. After a careful examination of the revenue law, it seems to us that if the taxes delinquent for several different years in the one case, and for different quarters in the other, constitute but one cause of action, then it is difficult to find those that are separate and independent. If A. should purchase goods of B., having a settlement monthly for the goods purchased during the month preceding, and at the end of a year B. should bring suit, he could unite the several amounts found due on settlement, because all arose out of contract, but each would have to be separately stated, because of being a cause of action by itself, in consequence of a settlement and separation from the rest of the account. Here the *law* settles and fixes the amount due for each quarter and does not allow it to become mingled with, or dependent upon, the taxes or proceedings of any other quarter. Every quarterly or yearly tax is an enforced contribution for the support of the state, and from its very nature must be a separate and independent liability. We now come to a consideration of the question whether a tax is a debt, or in the nature of a debt, and whether those due for different quarters can be collected in the same action. A conclusion in this case that a tax is in the nature of a debt could not help appellant, if it does not arise out of a contract, express or implied; and it may be conceded that, before the code, the action of debt was a proper remedy

for the collection of a tax, in case any action was allowed, and that several demands for debt could have been united.

"By the common law an action of debt is the general remedy for the recovery of all sums certain, whether the legal liability arise out of contract or be created by statute." (*United States* v. *Lyman*, 1 Mason C. C. R. 498.) That was an action of debt to recover certain duties. It was held to be a proper remedy, not because the amount claimed was due under a contract, but because, under the law, it was for a certain, definite sum for which the defendant was liable. Bouvier says: "Debt lies for a sum of money certain, due by the defendant to the plaintiff, whether it has been rendered certain by contract between the parties or by judgment or by statute." (3 Bouv. Inst. 627; see Bliss on Code Plead. sec. 243; *Meredith* v. *United States*, 13 Peters, 486, and *Portland D. D. Co.* v. *Trustees*, 12 B. Mon. 77.) It will be seen by reference to the authorities, however, that this class of cases does not strengthen appellant's case. Although they decide that, under the common law and the old practice, the action of debt was a proper remedy for the collection of a tax or duty, in the absence of a special statute, still they do not decide that such an action was proper because a tax or duty is a debt arising out of a contract, express or implied, and that is the condition of unity under section 64.

In comparison with the number holding an opposite doctrine, there are very few authorities which declare a tax an obligation or debt based upon or arising out of an implied contract. (See *Dugan* v. *Baltimore*, 1 Gill and J. 499; *The City of Dubuque* v. *The Ill. Cent. R. R. Co.*, 39 Iowa, 60; *Mayor* v. *McKee*, 2 Yerg. 167; 3 Bl. Com. 158.)

Opinion by Beatty, J., 2 Nev. 61, with dissenting opinion by Brosnan, J., Lewis, C. J., not participating in the decision. (See repub. vols. 1, 2, Nev. R. 588.)

In the first of the above cases no reasons are given in support of the doctrine stated. In the second, Bouv. Dict., tit. Contract, Chitty's Contracts, 2, and 3 Bl. Com. 158, are cited. Cole, J., dissents expressly.

And in relation to the reasoning of Mr. Blackstone, Jus-

tice Story, in 1 Mason, 288, says that "it is very refined and ingenious in theory, but it never has to its full extent been admitted in practice, as the foundation of legal remedies." The case in 2 Yerg. declares upon the authority of Blackstone, that by becoming a member of society a person tacitly promises to pay any debt or tax legally imposed, and for non-payment is liable to a suit upon such implied promise. We do not subscribe to the doctrine of the above authorities. It was a convenient fiction in the beginning, and can never arise to the dignity of reality. The authorities are overwhelming in favor of the conclusion that taxes are not debts in the sense that they are obligations or liabilities arising out of contracts express or implied, and in the true and usual sense, are not debts at all; but that they are "the enforced proportional contribution of each citizen and of his estate, levied by the authority of the state for the support of government, and for all public needs; that they owe their existence to the action of the legislative power, and do not depend for their validity or enforcement upon the individual assent of the taxpayer, but operate *in invitum.*" (Cooley on Tax, 13; Bliss on Code Plead. 128; *Johnson* v. *Howard*, 41 Vt. 125; 26 Id. 486; *City of Augusta* v. *North*, 57 Me. 394; *Geren* v. *Gruber*, 26 La. An. 697; *Loan Association* v. *Topeka*, 20 Wall. 664; *Pierce* v. *City of Boston*, 3 Met. 520; *Lane Co.* v. *Oregon*, 7 Wall. 78; *Perry* v. *Washburn* (wherein the court explains *People* v. *Seymour*, 16 Cal. 340); *Hanson* v. *Vernon*, 27 Iowa, 46; *Bradley* v. *McAlee*, 7 Bush. Ky. 673; *The City of Camden* v. *Allen*, 2 Dutcher, 398; *City of Carondelet* v. *Picot*, 38 Mo. 130; *Trenholm* v. *Charleston*, 3 Rich. S. C. 349; *Whiteaker* v. *Haley*, 2 Oregon, 139; *De Pauw* v. *City of New Albany*, 22 Ind. 206; 58 Me. 591.)

We deem it unnecessary to notice other points raised by counsel.

The judgment is affirmed, each party to pay its own costs on appeal.

BEATTY, C. J., concurring and dissenting:

I concur in the judgment on the ground that the action was barred by the statute of limitations.

I dissent from that part of the opinion of the court in which it is held that there was in this case a misjoinder of causes of action. If the principle of the decision upon that point affected only suits for taxes the matter would, perhaps, not be of sufficient consequence to justify any extended statement of the grounds of my dissent, for as long as the plain injunctions of the statute are obeyed there ought never to be more than one claim for delinquent taxes pending against the same person; and consequently it can not be presumed that the privilege of uniting two or more such claims in one action will ever hereafter be of any practical importance. But it will be seen from the reasoning of the court, and the authorities cited to sustain its conclusions, that the decision rests upon a principle that will include a great many other causes of action besides delinquent taxes, and that if it is consistently adhered to, the beneficent rule of the statute will be very greatly restricted in its operation. For in effect it is held that there is no implied contract to pay taxes *because, and only because, the obligation is imposed by statute, and does not depend for its validity upon the individual assent of the taxpayer;* because, in short, it is an obligation operating *in invitum.* Now, if this is a good reason for holding that there is no implied promise to pay a tax, it must equally follow that there is no implied promise to discharge any common law or statutory obligation which operates *in invitum,* and the result is that no two demands of that character can hereafter be united in the same action. This I regard as an extremely pernicious consequence, and therefore I shall endeavor to show that the doctrine from which it flows, although true to a certain extent, has no application to the construction of section 64 of the practice act. For this purpose I shall rely to a great extent upon the cases and writers whose authority is invoked by the court. In the first place, however, I wish to call attention to a principle of legal construction, which seems to have been to some extent overlooked: The office of interpretation is to determine the sense in which words have been used. The same word does not always mean the same thing. Not only are words employed in different

senses in different statutes, but the instances are not rare in which a word has been held to mean one thing in one part and another thing in another part of the same statute. What is true of other words of ambiguous import is emphatically true of the word *contract*—a word that has been used by law-writers of the highest reputation and authority sometimes in a very enlarged, and at others in a much more restricted, sense. In order to determine its meaning in any particular statute in which it may be found, it will always be necessary to look to its context, to the subject-matter, and to the spirit and object of the law. To hold that, because in construing one statute it has been interpreted in its ordinary and more restricted sense, it must therefore be taken in the same sense in every other statute, is simply to ignore one of the most familiar rules of legal construction. Yet this, in my opinion, is the mistake into which the court has fallen.

No one will deny that it has been frequently held, and correctly held, that a tax is not a debt or obligation *ex contractu* in the ordinary sense of those terms, or within the meaning of such statutes as the legal tender act, and the statutes of limitations, set-off, etc., of some of the states. The question here, however, is not as to the ordinary sense of the word contract, standing by itself in an ordinary statute, but as to its technical sense, as a term of art, when combined in a technical phrase, in a statute relating exclusively to technical matters, and therefore necessarily the work of professional hands.

The civil practice act permits the joinder of causes of action arising out of contracts, express or implied. What did the lawyers who framed the code of practice mean by the expression "causes of action arising out of contracts, express or implied?" Can it be doubted that they intended it to embrace all those causes of action which at common law were held to arise out of implied contracts? I at least entertain no doubt, and the authorities cited by the court (Bliss and Pomeroy) admit that the language of the act is to be taken in its broadest technical sense. This conclusion, moreover, is fortified by the fact that every considera-

tion of policy and convenience, as well as the whole spirit and object of the statute, favor such a construction.

The practice act is a remedial law. It was designed to simplify legal proceedings; to expedite them and render them less costly and burdensome to litigants. Many of its rules are borrowed from the practice in equity, and, in construing its provisions, courts have generally professed to be guided by the liberal and enlightened principles of equity, with a view to the promotion of justice, the discouragement of oppression and the prevention of needless expense and delay. For all these reasons, I not only feel authorized, I feel constrained, to give the largest and most liberal possible construction to the provision in question. For it can not be denied that the rule of equity and of sound policy is against the unnecessary multiplication of suits. When a number of demands of similar nature, involving similar principles and results, capable of being heard together without inconvenience, and open to the same defense, can all be embraced in the same judgment, they ought to be united in the same action, not only for the sake of the litigants, but also for the sake of the public. This is the doctrine of equity (Story's Eq. Pl., secs. 530-1-2), and this is the spirit of section 64 of the practice act, as is shown by the restrictive clause near the end, which prohibits the joinder of actions, unless they "all belong to only one of these classes and shall affect all the parties to the action, and not require different places of trial." This express limitation upon the right of uniting separate causes of action in the same suit proves that it was the intention of the framers of the law that, subject to its own positive restrictions, it should be largely and liberally construed. *Exceptio probat regulam.*

It is not denied—indeed, it is tacitly conceded, both in the argument of counsel and in the opinion of the court—that it would be better if the law allowed the joinder of the several causes of action set out in this complaint. The court decides, only because it feels compelled to decide, that a delinquent tax is not a "cause of action arising out of an implied contract." To this conclusion it is forced by

what it deems the overwhelming weight of authority. I might feel similarly constrained if I found the long list of cases cited by the court to be strictly in point, and found nothing more on the other side than the two or three cases referred to in its opinion. But I think I may safely affirm that whoever will take the trouble to make a critical examination of the authorities relied on will find that a large number of them have a very remote, and some of them no bearing whatever on the question at issue. There are, however, quite a number of them, following the case of *Pierce* v. *Boston* (3 Met. 521), which hold that an obligation operating *in invitum* is not a contract *in the ordinary sense of the word*, and therefore (on the principle that words are presumed to be used in their ordinary sense unless there is something in the context or spirit and object of the law to prove the contrary) that taxes are not embraced by the words "contract" and "debt," as used in the legal tender act and in certain statutes of limitation, set-off, etc. I do not question the correctness of these decisions. They are, in fact, entirely consistent with the principle of interpretation which I invoke; for in every single instance in which a tax has been held not to be a debt or obligation *ex contractu*, the whole spirit and object and policy, and sometimes the express words, of the statute in question were opposed to an enlarged and liberal interpretation of the words. The fact, therefore, that an obligation imposed by law and operating *in invitum* is not a contract in the ordinary sense of the word was a perfectly valid ground for those decisions. But can it thence be inferred that such obligations were not held to be implied contracts at common law, and that they are not embraced in the provisions of section 64 of the practice act? This question is answered in the negative by the very authorities relied on by the court.

Bliss on Code Pleading, section 128, is cited. In that section the author is treating the identical question under consideration, and this is his language: "The permission is to unite actions upon contracts, express or implied. It is said that an implied agreement is but an obligation, created by law, warranted by justice, but not by the assent—and

often against the assent—of those to be charged. So far as this is so, such obligations have no affinity with contracts and can not upon principle be classed with them. To call such an obligation a contract was always a fiction." This is the passage cited, and certainly it does show that the doctrine of implied contracts was always, to a great extent, based upon a legal fiction. But what if that legal fiction has been recognized and adopted by the statute as a means of definition, and as the basis of substantial rights? In that case it seems to me that, at least for the purpose of construing the statute, the "convenient fiction" so cavalierly treated in the opinion of the court does "rise to the dignity of reality." Now, what does Mr. Bliss say on this subject? I quote from the same section (128), a little lower down: "There were cases (at common law) in which assumpsit would lie where no promise, as a fact, could be implied; where the allegation of a promise was a naked fiction; where there was an obligation merely, and where, logically—if any logical deduction had governed the common law pleaders which did not spring from a fictitious premise—debt, or case, or trespass, should have been the form of action. I refer to legal obligations in respect to those through whom the debt accrued, and to obligations arising from injuries. Thus one might lay a promise from the husband or father to pay for necessaries furnished to a wife or child, although furnished against his express command, and also lay a promise to pay for goods wrongfully converted by the defendant, although under a claim of ownership. *As the code expressly refers to implied contracts, these as well as those where the agreement is understood, will probably continue to be treated as agreements, and thus one of the most marked fictions of the common law pleading is perpetuated.*" From the last sentence in the above quotation (which I have italicized), it clearly appears that this author, although disposed to find fault with the "common law fiction" of implied contracts, is nevertheless convinced that within the meaning and for the purposes of section 64 of the practice act that fiction has been "*perpetuated.*" What rank Mr. Bliss is to take as an authority on code pleading is not yet deter-

mined, and I have only been induced to quote his opinion at so much length because he is included in the list of authorities deemed "overwhelming" by the court. I have shown, I think, conclusively that upon the point at issue he ranges himself distinctly against the opinion of the court. So also does another text writer who is quoted at great length and highly commended by the court in connection with another branch of the case. (See Pomeroy's Remedies and Remedial Rights, sections 492, 493, and cases cited.)

Upon the opinion of these two writers, in the absence of any authority to the contrary, I am willing to rest the correctness of my conclusion, that the provisions of section 64 of the practice act embrace all causes of action arising out of implied contracts, in the widest sense of that expression as used by common law pleaders.

It remains only to be seen whether the obligation of the tax-payer was one of those upon which a promise was implied at common law. That it was, has been held, not only in the cases referred to by the court, but in other cases to which I shall call attention, and the contrary has never, to my knowledge, been decided in any case. It has been frequently decided, and such is probably the settled law, that where the statute provides another remedy a suit for taxes can not be maintained; but it has never been denied that, in the absence of any other remedy, *debt or assumpsit* would lie for the collection of delinquent taxes. None of the cases cited in the opinion of the court are opposed to this statement. The utmost extent to which they go is, I repeat, that a tax is not a debt or obligation *ex contractu, in the ordinary sense of those terms,* and therefore that taxes are not debts or contracts within the meaning of certain statutes whose spirit and object do not embrace them. I have not the slightest fault to find with this doctrine. I only object to its application to a case which depends upon a different principle; for it is constantly to be borne in mind that the *reason, and the only reason,* why in those cases it was held that a tax was not a debt, was that it is an obligation imposed by statute and operating *in invitum.* But I have shown that, in the opinion of Mr. Bliss and Mr.

Pomeroy at least, section 64 of the practice act embraces obligations of that precise description. I shall endeavor, further, to show from numerous decided cases that at common law a promise to pay was always implied where the law, whether common or statute law, or the judgment of a court, imposed an obligation to pay.

Three cases (1 Gill and J. 499; 39 Iowa, 60, and 2 Yerg. 167) are referred to by the court as holding that from the obligation to pay a tax a promise to pay will be implied. We are left to infer that these are the only cases that sustain the doctrine, and an attempt is made to disparage their authority by pointing to the fact that they cite only Blackstone and Chitty, Jr., and that they assign no reasons for the doctrine stated. It is a mistake, however, to suppose that there are no other decisions to the same effect, and it is equally a mistake, in my opinion, to suppose that there is any real conflict between these decisions and the long list of cases cited in support of the conclusions of the court. If there were any such conflict it might be very pertinently remarked that even Blackstone and Chitty are better than no authority at all; and while it is true that they alone are cited in support of the doctrine stated in the three cases referred to, it is equally true that no decision and no writer is cited in support of the doctrine of *Pierce* v. *Boston*, and the other cases in which it has been followed. But in truth, there seems to have been very little need of citing authority in support of either set of decisions, one of which rests upon the admitted fact that the word "contract," in its ordinary sense, does not include involuntary obligations, and the other upon the well-understood maxim of the common law that, for the sake of affording a remedy, the law will always imply a promise from any legal obligation to pay. This principle is plainly stated in the case of *The Mayor of Baltimore* v. *Howard*, 6 Harris and Johns. 394, in which it was held that the action of assumpsit would lie for a delinquent tax. And in its practical form, I am not aware that the rule has ever been seriously questioned, although the explanation of its origin, or the ground upon which it rests, as given by Blackstone (3 Com. 158), has been un-

favorably criticised. It makes no difference, however, what the origin of the maxim was; it concerns us only to ascertain its meaning and proper application. When we know what causes of action were held to arise out of contract before the code, we shall know what causes of action can be joined under the provisions of section 64.

What is said by Blackstone in relation to implied contracts, in the passage referred to, is as follows: "Of this nature are, first, such as are necessarily implied by the fundamental constitution of government, to which every man is a contracting party. And thus it is that every person is bound, and hath virtually agreed to pay such particular sums of money as are charged on him by the sentence or assessed by the interpretation of the law. For it is a part of the original contract entered into by all mankind who partake of the benefits of society, to submit in all points to the municipal constitutions and local ordinances of that state of which each individual is a member. Whatever, therefore, the laws order any one to pay, that becomes instantly a debt, which he hath beforehand contracted to discharge," etc.

This is the doctrine, if not the exact passage, commented upon by Mr. Justice Story in the language quoted by the court from the decision in *Bullard* v. *Bell*, 1 Mason, 288. By reference to that case it will be seen that Judge Story expressly admits that a "mere legal liability, created by statute," "may furnish the foundation or consideration of a contract, express or *implied*," although it "is not of itself a contract." All that he denies is so much of Mr. Blackstone's reasoning as holds that it is a contract in itself. He does not deny that the cause of action upon such an obligation is, in a technical sense, a cause of action arising out of contract. Moreover, the only reason given by Judge Story for dissenting from the doctrine as stated by Blackstone is an utterly inconclusive reason. He says: "If it were universally true, then *indebitatus assumpsit* would lie to recover a fine on a criminal sentence or a penalty or forfeiture upon a penal statute, which certainly can not be pretended." With all proper deference to the opinion of Judge Story

(who, by the way, has been more than once repudiated by this court), I think a sufficient reason can be assigned why a fine or penalty or forfeiture was not recoverable in assumpsit without the slightest reference to the universality of the principle stated by Blackstone. The action of assumpsit, as is well known, lay only upon *parol* or *simple* contracts; it was not the remedy allowed for the recovery of any sum *due by specialty*. Therefore, when a sum certain was due by statute the action of debt only would lie, for the statute was deemed for that purpose a specialty. This precise point is decided by Judge Story himself in the case under consideration, and in fact the point upon which the decision turns is that a sum certain due by statute is a sum due by specialty. (1 Mason, 289.) The action of *debt* was as much an action *ex contractu* as the action of assumpsit; the only difference was that *debt* was in some respects a more extensive remedy than assumpsit. It would lie upon some contracts (specialties, including penal statutes), which would not support assumpsit. (1 Chitty's Pl. 121.) It is therefore a complete *non sequitur* to argue that because the action of assumpsit would not lie to recover a statutory penalty there was no implied contract to pay it. The fallacy of such a conclusion is demonstrated more completely by the fact that assumpsit would always lie to recover money due upon a statutory obligation in those cases where the statute could not be treated as a specialty (1 Chitty's Pl. 119); that is to say, in all cases where the amount to be recovered was unliquidated. For it is obvious that there is no principle upon which a promise to pay an uncertain amount can be implied which will not equally sustain the implication of a promise to pay a sum that is ascertained.

A great authority on common-law pleading has said "that all actions of debt whatsoever are founded upon a contract raised either in fact or by construction of law." This was an admission made against himself in arguing the case of *Hodsden* v. *Harridge* (2 Saunders, 66) by Mr. (afterwards Chief Justice) Saunders. Considering his high reputation as a lawyer, and the authority of his reports upon questions of pleading, such an admission, re-

ported by himself after his retirement from the bench, is, in my opinion, entitled to quite as much weight as a *dictum* of Judge Story.

But even admitting it to be true, for the sake of the argument, that it is only where the action of assumpsit will lie that a promise to pay is implied, "it is the general rule that, for money accruing, due under the provisions of a statute, the action of assumpsit may be supported unless some other remedy is expressly given." (See *Hillsborough County* v. *Londonderry*, 43 N. H. 453, and the long list of cases therein cited; see also *Bath* v. *Freeport*, 5 Mass. 325, and *Watson* v. *Cambridge*, 15 Id. 286.)

These were cases in which counties and towns were sued in assumpsit upon their statutory obligation to support paupers. In a case above cited (*Mayor of Baltimore* v. *Howard*, 6 Harris and Johns. 383) assumpsit was held to be the proper form of action for the recovery of a delinquent tax. In the case of *Rann* v. *Green* (Cowper, 474) Lord Mansfield held that the law raised an assumpsit upon the order of commissioners fixing the amount of tithes under a private act of parliament. That was an action for assumpsit for a sum *liquidated* by the order of the commissioners; in other words, it was a suit for a tax assessed upon the defendant by authority of law. In *Peck* v. *Wood* (5 Term R. 130) the defendant was sued in assumpsit upon his statutory obligation to contribute to the expense of a party wall, and the action was maintained. We have then, besides Blackstone and Chitty, jun., the authority of Chief Justices Saunders, Mansfield and Kenyon of the king's bench, and the supreme courts of Massachusetts, Vermont, New Hampshire, Maryland, Tennessee and Iowa for the proposition that the law raises an implied promise upon statutory obligations, and of Mr. Bliss and Mr. Pomeroy that such promises are embraced by section 64 of the code. On the other side there is nothing except the case of *Pierce* v. *Boston*, and like cases, in which it has been held that an obligation, imposed by statute and operating *in invitum*, is not a

contract in the ordinary sense of the term. In my opinion there is no conflict between the two classes of decisions, and I am confirmed in this view by the fact that, in the same State (Massachusetts) in which a tax has been held not to be a contract within the meaning of the statute of set-off, because it is an obligation operating *in invitum,* it has also been held that assumpsit will lie upon the statutory obligation of a town to support its paupers, and no one has suggested that the two decisions are in conflict.

In conclusion, I think I may fairly claim to have proved that section 64 of the code was intended to embrace all cases in which a contract was implied prior to its enactment, and that a contract was implied upon all statutory obligations to pay money. That a tax is a statutory obligation has not only been decided, but it cannot be denied. Indeed, it is something more than a statutory obligation. The people, acting in their primary capacity, have put into the constitution a distinct acknowledgment of the inherent duty of every citizen to contribute to the support of the government in proportion to his means, and they have expressly delegated to the legislature the power to levy uniform taxes. The legislature, therefore, does not impose the duty. It is a duty recognized as existing antecedent to any legislation—a duty not created, but merely regulated by law. No possible distinction can be drawn between the duty to pay taxes and the statutory duty to support paupers, or the common-law duty to support wife and children, to pay tithes, or compensate the owner of goods wrongfully converted. As has been said by the most recent American writer on the law of taxation (Burroughs, 254), " a citizen enjoys the benefit of government, his person and his property are protected, and the expenses of the government are to be paid; will not the law in like manner raise an implied promise that the citizen shall pay his proportion of the expense? And when it is ascertained in the mode prescribed by law what amount he should pay, should there not be considered an implied promise that he will

pay the amount? Taxes are a political necessity. If the law raises a promise to pay, that one of its citizens may not obtain the services or goods of another without compensation, surely it will raise it that the state may exist."

Upon these grounds I dissent from the conclusion that there was a misjoinder of causes of action.